UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

NOLAN C. TURNER, III          CIVIL ACTION NO. 06-cv-2213

VERSUS          JUDGE WALTER

LOUISIANA STATE PENITENTIARY          MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Nolan Turner, III ("Petitioner") of first degree murder. After the penalty phase of the trial, the jury made a unanimous recommendation of life imprisonment rather than the death penalty. The sentence was imposed, and Petitioner pursued a direct appeal. State v. Turner, 859 So.2d 911 (La. App. 2d Cir. 2003), writ denied, 871 So.2d 347 (La. 2004). Petitioner also pursued a post-conviction application in the state courts. He then filed this petition for federal habeas corpus relief. For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

**A. Introduction**

Petitioner argues that the evidence was insufficient to support his conviction of first degree murder, which is defined as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of certain felonies, including armed robbery. A conviction is also

proper when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. La.R.S. 14:30. The conviction in this case is based on the killing of an armed robbery victim. A second victim was shot and paralyzed. Petitioner argues that the evidence was insufficient because there was no physical evidence to link him to the crime, the eyewitness identifications were unreliable, and specific intent to kill or inflict great bodily harm was not proved.

**B. The Evidence**

The evidence at trial showed that on July 8, 1999, Jason Heath Winn ("Heath") and his father, Doyle Wayne Winn, were working in their tire store on Jewella Avenue, in Shreveport. Heath's eleven-year-old brother, Garrett, was inside the store playing with his friend, Bennett Berryman (often referred to in the testimony as "Little B"), who was about six years old. All four were in the office when two men with handguns walked into the store. One of the armed men had short hair, and one had long, shoulder-length hair. The man with the long hair shut the overhead door in the office area.

Heath, without being asked, immediately handed the long-haired man approximately $140 cash. The men then told the victims to "get to the back." One of the men told the victims to lie down. Heath complied; however, his father began to scuffle with the long-haired man and told Heath to get up. As Heath attempted to get up, the long-haired man shot him twice. Heath testified that he saw his father, Doyle, then pause, and the long-haired man shot Doyle twice. As the two gunmen men fled the building, the short-haired man

grabbed some of the money that had fallen to the floor. Heath heard two more gunshots (which apparently did not hit anyone). Doyle Winn died at the scene. Heath survived, but he is now a paraplegic.

On the day of the crime, at about 5:00 p.m., Linda Tyler was leaving her job at Morning Star Baptist Church, across the street from the tire store. Tyler testified that as she waited for the traffic to clear, she noticed that the door to the tire store was partially closed. She thought that was unusual for the time of day. Tyler saw a man come out of the tire store, pause for a moment, and then run down the street. She then saw a second man, who had long hair, back out of the tire store shooting while a gun. The long-haired man ran across Jewella Avenue toward Tyler and then down Baxter Street. Tyler drove onto Jewella Avenue and down Baxter street in an attempt to follow the long-haired man. However, she had to turn around because of construction work in the area. As Tyler drove back up Baxter Street, the long-haired man walked toward and "right by" her.

Shreveport Police Detective Ronnie Jeter developed Petitioner as a suspect. He prepared a computer-generated lineup, printed in both color and black and white formats. Linda Tyler and six year old Bennett both positively identified Petitioner's photograph (Number 5) as the long-haired man.

Four days after the crimes, Detective Jeter questioned Petitioner at the police station. Petitioner was advised of his Miranda rights. He refused to sign a written form regarding his rights, but he did orally agree to give a statement to Detective Jeter. Petitioner said that he

was in Bossier City the night before the crime and most of the day of the crime. He claimed that at the time of the crime he was at Ike's Barber Shop in Shreveport, where he contacted a friend, Santanian Dixon.

Isaiah Shine, the proprietor of Ike's Barber Shop, testified that he had known Petitioner since Petitioner was a young man, he considered Petitioner a friend, and Petitioner often visited the shop to hang out. The shop and vacant lot near it were a common gathering place to drink beer and visit. Mr. Shine said that he was the last person to leave his shop on the day of the crime. He left at about 5:30 or 6:00 that evening. There was no one outside the shop at that time, and Shine had not seen Petitioner that day. Shine conceded on cross-examination that it was possible Petitioner had been outside the shop that day and that Shine just did not see him. Tr. 1937-42.

Santanian Dixon, who worked with Mr. Shine and was a lifelong friend of Petitioner, testified that Petitioner came to visit him just about every day. Mr. Dixon said that he left the shop between 5:00 and 6:00, before Mr. Shine, on the day of the crime. Some men were hanging out at that time, but Petitioner was not among them. He thought he had seen Petitioner at the shop earlier in the day, around lunch, but he had not seen him that afternoon. Mr. Dixon conceded that he was inside the shop all day and may not have seen Petitioner if Petitioner had been outside. Tr. 1942-46.

At trial, Heath positively identified Petitioner as the person who shot and killed Doyle (and also shot Heath). Heath also described how he had earlier identified Petitioner in the

photo lineup.  Tr. 1999-2011.  Ms. Tyler testified at trial and also positively identified Petitioner as the long-haired man she saw shoot a gun and run from the tire store on the day of the crime. Tr. 1855-64.  Bennet Berryman, only six at the time of the crime, was nine by the time of trial. He testified that he recalled picking Petitioner from the photo lineup, but he could not articulate any particular reason for his selection. Bennet also could not identify Petitioner in the courtroom as one of the robbers. Tr. 1830-37. The defense did not present any evidence during the guilt stage of the case.

### C. Standard of Review

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).  The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court cited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the State court's decision was an "unreasonable

application" of <u>Jackson</u>. 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1523 (2000); <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. <u>Williams</u>, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. <u>Lockyer v. Andrade</u>, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

**D. Analysis**

Petitioner raised on direct appeal the same arguments that he makes to this court. He pointed to the lack of physical evidence to connect him to the crime and argued that the eyewitness identifications were unreliable. Petitioner argued that the lineups were suggestive (an issue addressed below) and that there were discrepancies in the testimony of the witnesses. Petitioner also noted that 11-year-old Garrett once described the man with the long hair as having one or more gold teeth, which Petitioner lacks.

The state appellate court considered Petitioner's various arguments and found that they amounted to a request that the court re-weigh the evidence and reassess the credibility of the witnesses. The court recognized that those tasks were properly committed to the jury, which found the state's evidence persuasive. Key evidence included the testimony of two eyewitnesses, one of whom was in the store and within a short distance of the shooter during the crime. The other eyewitness saw the shooter leave the store and then followed him down the street to get a much closer look. With regard to specific intent to kill or inflict great bodily harm, the court held that twice firing a gun at a person at close range was adequate evidence for the jury to find that element of the crime. See State v. Turner, 859 So.2d at 917-20.

Petitioner repeats his same arguments to this court. The state court properly restricted its review of the issue to that permitted by Jackson, so it did not weigh the evidence or assess credibility of witnesses. Rather, the state court determined that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of first degree murder beyond a reasonable doubt. This court's review is even more limited, restricted to granting relief only if the state court's decision was an objectively unreasonable application of the principles in Jackson.

The defense attempted to impeach the reliability of the identification witnesses, and it made some good points along the way, but the jury obviously decided that it believed the state's witnesses were reliable. Neither the state court nor this federal court may lawfully

second-guess such jury determinations. The undersigned finds, after review of the evidence discussed above, that the state court's decision was entirely reasonable and fully supported by the record. The conviction should not be vacated based on this issue.

**Photo Lineups**

Petitioner argues that the trial court erred in denying his motion to suppress the results of the photo lineups. Trial Judge Leon Emmanuel, III conducted a pretrial hearing on the motion. Detective Jeter testified (Tr. 651-62) that he prepared a lineup of six color photos. He said the machine he used also automatically printed a black and white copy. Petitioner was photo number five. A copy of the lineup is attached to the State's memorandum. Each of the men in the photographs appears to be black and about the same age, and each man has a similar hairstyle.

Detective Jeter showed the color lineup to Linda Tyler. She said number five looked like the suspect that she saw run from the store, but the shade of the light on his forehead made her uncertain. Jeter then showed Ms. Tyler the black and white copy, which did not have the shine on it, and she immediately chose number five.

Detective Jeter showed the color lineup to Heath Winn, who was still in the hospital. Jeter did not ask Heath whether he was on medication. He showed Heath the color lineup, but not the black and white, and Heath quickly picked number five.

Detective Jeter showed the color lineup to six-year-old Bennet Berryman, who pointed at number five. Bennet, together with his adult cousin, signed the back of the lineup to indicate his selection.

Linda Tyler testified about how the robber "passed right by me" when she was trying to get a look at him. She recalled how there was something about the color lineup that she could not put her finger on, but the black and white photo "just appealed to me, I could just see because I guess the way I remembered his face and everything." One of the reasons she picked number five was his forehead/hair area "stuck out." Tr. 662-70. Bennet Berryman testified and confirmed that he selected a photo and signed his name behind it. He said he automatically selected the photo and was sure about his selection, but could not say specifically what it was that made him pick the photo. Tr. 670-81. Ruby Smith, Bennet's adult cousin, testified that she saw Bennet select a photo "pretty quick" and that the officer did not tell the child which photo to select. Tr. 682-84.

Heath Winn testified that he was just out of ICU when he viewed the lineup. He said he was on medications at the time, but it did not affect him mentally or make him groggy. The long hair and face drew his attention to the photo he selected. Tr. 684-93.

A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must determine whether, under the totality of the circumstances, the

suggestiveness leads to a substantial likelihood of irreparable misidentification. <u>Coleman v. Quarterman</u>, 456 F.3d 537 (5th Cir. 2006).

The Supreme Court has identified several factors to help determine the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. <u>Coleman</u>, <u>supra</u>, citing <u>Neil v. Biggers</u>, 93 S.Ct. 375 (1972). Unless the circumstances show "a very substantial likelihood of irreparable misidentification" then the identification is admissible, and its weight is for the jury to decide. <u>Manson v. Brathwaite</u>, 97 S.Ct. 2243, 2254 (1977).

Of course, this court may not grant habeas relief unless the state court's decision was an objectively unreasonable application of the principles set forth in Supreme Court decisions such as <u>Neil</u> and <u>Manson</u>, 28 U.S.C. § 2254(d). The trial judge denied the motion to suppress. He noted that the identifications were not based on any undue prejudice or suggestion, and each witness testified to his satisfaction that he or she was certain as to the identification. Tr. 696.

Petitioner argues that the color lineup purposely included glare on his face (only). He argues that the black and white photo includes stripes running from the top to the bottom of his photograph but not the others, and he suggests that this was done intentionally. The state appellate court found that "four of the six photographs, including the defendant's

photograph, had some type of glare or shine on the forehead and the other three photographs had some highlights on the nose and/or mouth." Thus, the glare or shine "was certainly not suggestive because it did not focus attention on the defendant." As for the black and white photo, the line noted by Petitioner "also appeared on photograph numbers 2, 3 and 6." The appellate court found, based on these facts and the factors set forth in Manson, that the trial court did not err in finding the identifications reliable. State v. Turner, 859 So.2d at 920-21.

Petitioner has not presented any evidence to show that the appellate court's factual findings about the glare and line are wrong, and those findings largely defeat Petitioner's argument. A determination of a factual issue made by a state court is presumed to be correct, and a habeas applicant has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner has presented nothing to rebut the state court's findings about the appearance of the lineup. Several of the Manson factors also support the state court decision. The three witnesses each had an opportunity to see Petitioner at close range at the time of the crime. Ms. Tyler, in particular, paid attention to Petitioner as she kept an eye on him after the shooting. The three witnesses were each certain about their identifications, and only a few days passed between the crime and the identifications. Considering these factors, this court cannot say that the state court's decision of this issue was an objectively unreasonable application of clearly established federal law, as determined by the Supreme Court. See 28 U.S.C. § 2254(d)(1). Habeas relief is not available.

**Motion to Suppress Statement**

Petitioner argues that the trial court violated his right against self incrimination when it denied a motion to suppress the statement Petitioner gave to Detective Jeter. The trial court held a hearing on the motion. Jeter testified that he read Petitioner his <u>Miranda</u> rights from a form. Petitioner refused to sign a form to indicate that he understood his rights, but he did agree to give a statement. Jeter testified that he had no doubt that Petitioner consented to answer questions even though he refused to sign the form. Jeter said that suspects are often wary of signing anything, yet will agree to talk.

Petitioner gave Detective Jeter the statement in which he claimed to have been at the barber shop. After Jeter found this alibi lacked support, he talked to Petitioner a second time and again read him his <u>Miranda</u> rights. Petitioner then gave his second statement, in which he expressed surprise that his barbershop alibi was not supported. Neither statement was recorded, and Jeter had no explanation for that other than his thought that Petitioner probably was not going to say anything.

Judge Emmanuel found that Petitioner made a free and voluntary waiver of his constitutional rights in connection with the statements. Tr. 700-14. The state appellate court reviewed the relevant testimony at length and determined that it supported the trial judge's decision that Petitioner's statements were freely and voluntarily given after Petitioner was advised of his <u>Miranda</u> rights. <u>State v. Turner</u>, 921-23.

Petitioner points to his refusal to sign the rights form and the lack of a recording as evidence he did not voluntarily waive his right to remain silent. Petitioner did not testify at the hearing, so the decision rested solely on the testimony of Detective Jeter. The trial judge stated that there was no basis to impeach Jeter's testimony, and he accepted it as meeting the state's burden. Petitioner's federal petition repeats his state court arguments, and they again fall short. The state court's decision was not an objectively unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence that was presented. See 28 U.S.C. § 2254(d).

**Challenges for Cause**

Prospective jurors were questioned about their views of the death penalty. Petitioner challenged prospective jurors Kevin Carter and Gina Sharp on the grounds that they indicated they would not consider the imposition of a life sentence in a murder case.

The state appellate court noted that Petitioner made what is called a "reverse-Witherspoon challenge that seeks to exclude a juror who will not consider a life sentence and will automatically vote for the death penalty under the facts before him. The appellate court rejected the claim because the jury recommended a life sentence in this case, and Louisiana courts have consistently held that there is no valid Witherspoon complaint where the jury does not recommend the death penalty. State v. Turner, 859 So.2d at 926-27.

Petitioner's federal petition simply repeats the substance of the challenges for cause, but Petitioner cites no legal authority that would require a habeas court to set aside his

conviction and life sentence based on challenges that his jurors were biased toward the death penalty. Habeas relief is not available because Petitioner has not demonstrated that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

**Ineffective Assistance: Alibi Witness**

Petitioner argued in his post-conviction application that his counsel were ineffective because they did not call his girlfriend, Denise Tucker, to testify as an alibi witness. Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if they made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, they were not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The test for habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the state court's decision – that the petitioner did not make the Strickland showing – was contrary to, or an unreasonable application of, the

standards provided by <u>Strickland</u>'s clearly established federal law. <u>Williams v. Taylor</u>, 120 S.Ct. 1495 (2000); <u>Henderson v. Quarterman</u>, 460 F.3d 654, 665 (5th Cir. 2006).

Detective Jeter's police report supplement includes a note that Denise Tucker contacted him on July 15, 1999. She said that she was Petitioner's girlfriend and that Petitioner was with her all day until about 7:00 to 8:00 p.m. on the day of the robbery-murder. Tucker said that she drove Petitioner to an address on Flora Street at about that time. Jeter replied that Petitioner had told him he was with someone else in Bossier City on the day of the crime. Tucker said that was a lie. Tr. 2615.

Petitioner filed with his post-conviction application an affidavit from Tucker. She testified that she came to the courthouse to testify as an alibi witness but was denied access to the courtroom. (As a subpoenaed witness, Tucker would have been subject to the rule of sequestration and not allowed in the courtroom.) She said she arrived ready to testify but never had the opportunity, and defense counsel Kurt Goins told her that she was no longer needed to testify. Tucker said she later visited counsel's office and had a lengthy conversation about why she was not called to testify. Tucker does not reveal the contents of that conversation in her affidavit. Tr. 262-13.

The state filed an affidavit from Attorney Goins. He testified that he tried on a number of occasions to contact Ms. Tucker and interview her as a potential penalty phase witness. A social worker that the defense team hired to develop a social history of Petitioner also attempted to contact Ms. Tucker, but he was also unsuccessful. Goins testified that he

did subpoena Ms. Tucker for trial and sent her a courtesy letter. A copy of the letter is in the record, and it includes a request that Tucker contact Goins by telephone. Goins testifies that Ms. Tucker never called him in response to his calls or the letter. The weekend before the trial, Goins and two other members of the defense team again tried to contact Ms. Tucker by telephone, but they received no response.

Attorney Goins testified that he did not hear from Ms. Tucker until she called him while the jury was deliberating in the guilt phase. Goins interviewed Tucker at that time. Tucker said that she had put Petitioner "out of the house, because he wasn't coming up with the money." She added that she gave Petitioner a ride on the day of the crime and dropped him near the corner of Flora and Jewella, about one-half hour after the robbery-homicide.

Attorney Goins testified that he was not aware that Tucker was a potential alibi witness before the time of Tucker's call, which came too late to allow her to be called at trial. Furthermore, given Tucker's statement, Goins opined that she would not have made a suitable alibi witness for two reasons. First, Petitioner's original alibi witnesses, from the barbershop, did not confirm his alibi, and only hurt the defense. (Evidence of a second uncorroborated alibi would even further test the strength of the defense's argument that Petitioner was not guilty.) The second reason was that Ms. Tucker's statement would have placed Petitioner within walking distance of the crime scene near the time of the crime, and it would have supplied a motive (need for money) for the robbery. Goins found Ms. Tucker's

statement so potentially disastrous that he elected not to call her as a witness in the penalty phase either. Tr. 2531-32, 2611.

The trial court reviewed this evidence and determined that Petitioner had not shown that defense counsel was deficient or that there was a reasonable probability that, had Ms. Tucker testified, the outcome of the trial would have been different. Tr. 2533-35. The state appellate court found that the claim was properly denied by the trial court, citing the same reasons. Tr. 2638. The Supreme Court of Louisiana denied writs without comment. Tr. 2758.

The state court's resolution of this issue was an entirely reasonable application of Strickland to the facts before it. Ms. Tucker admittedly did not communicate with defense counsel before the trial, and there is ample evidence that three members of the defense team made several efforts to contact her. When Ms. Tucker did talk to defense counsel, she offered an alibi that had the perhaps unintended consequences of suggesting a motive for the crime and giving Petitioner an opportunity by being in the vicinity of the crime about the time it was committed. Defense counsel reasonably determined that he would not have called Ms. Tucker to the stand with her story even if she had contacted him earlier. There is no basis, given this record and the demanding standards of Section 2254(d), for the federal court to overturn the state court's decision on this issue and vacate the murder conviction.

**Denial of Motion to Dismiss Counsel**

Petitioner was represented at trial by Kurt Goins and David McClatchey, court-appointed attorneys from the Indigent Defender Office. Petitioner sent a letter to Judge Emmanuel to complain about his attorneys' trial preparation. That led to a lengthy hearing at which Petitioner argued that his counsel should be dismissed. Petitioner argued that his attorneys refused to pursue the alibi defense that he desired and that their efforts were limited to attempting to persuade Petitioner to plead guilty to avoid the death penalty. Petitioner also argued that his counsel had a conflict of interest because Petitioner had filed a federal civil rights suit against them based on their alleged lack of performance in defending the case. Counsel said they were not aware of the suit.

Counsel responded that they and an investigator had explored the proposed alibi witnesses identified by Petitioner and found the defense lacked merit. Mr. McClatchey stated that the attorneys and investigators had talked to the alibi witnesses, "and we found that avenue or that defense, in our opinion, would not be very good." Attorney Goins added with respect to the alibi defense, "To be blunt, it's a sieve." Counsel added that they had discussed other defense strategies with Petitioner. As for pleading guilty, counsel said they had approached the prosecution about the prospect a plea deal to less than first degree murder, but the state had never agreed to accept any such plea. With respect to the civil suit, counsel said they were not even aware a complaint had been filed until Petitioner made that claim minutes earlier.

The trial judge, after lengthy discussions of these issues, ordered that the trial begin with appointed counsel representing Petitioner. The court added that Petitioner could renew his objection at any day during the trial, and the court would be watching the defense team carefully to ensure they were putting forth the requisite effort and communicating adequately with their client. The judge stated that if he saw evidence of a lacking defense, he would reconsider Petitioner's motion. Tr. 806-34. Petitioner does not cite any evidence that the issue was raised again at trial.

Petitioner argued in his post-conviction application that the trial judge violated his right to a fair trial when he denied the motion to dismiss appointed counsel. Judge Emmanuel rejected the claim, noting that he had already found (with respect to the Strickland claim raised in the application and discussed above) that counsel had ample reason to not pursue the proposed alibi defense, there was no plea offer from the prosecution or indication the state would have accepted a guilty plea, and Petitioner did not supply the court with the federal suit he alleged to have filed against his counsel. Tr. 2535-36. The state appellate court held that Petitioner had shown no prejudice from his claims relating to the removal of appointed counsel. Tr. 2638.

Petitioner repeats to this court his arguments that counsel believed he was guilty and concentrated their efforts on getting him to plead guilty rather than preparing an alibi defense for trial. Unless counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, complaints about his strategy are assessed under the two-prong

performance and prejudice test of <u>Strickland</u>.  <u>See</u> <u>Bell v. Cone</u>, 122 S.Ct. 1843 (2002);

<u>Haynes v. Cain</u>, 298 F.3d 375 (5th Cir. 2002) (en banc).  Counsel cross-examined witnesses

in an effort to attack the reliability of the identification and other evidence, and they argued

that the facts did not indicate that the robber fired with specific intent to kill or inflict great

bodily harm.  Accordingly, they did not entirely fail to subject the prosecution's case to

meaningful adversarial testing.  Assuming, for the sake of argument, that counsel were

required to pursue the alibi defense based on the insistence of their client, Petitioner has

failed to establish prejudice.  The state court received evidence concerning the proposed alibi

witness, and that evidence does not give rise to a reasonable likelihood that Petitioner would

have been acquitted if only Ms. Tucker had taken the stand and offered her uncorroborated

claim that her boyfriend was with her until she delivered him, short of money, to near the

scene of the crime at approximately the time the crime was committed.  To the extent one

might possibly argue with that conclusion, this court must also ask whether the state court's

decision was such an incorrect application of the <u>Strickland</u> prejudice prong as to be not

merely incorrect but objectively unreasonable.  The undersigned finds the state court's

resolution of the issue was entirely reasonable and recommends that no relief from the

conviction be granted based on this argument.

The same is true with respect to the conflict argument stemming from the alleged

federal civil suit.  This court can take notice from its records that Petitioner filed his civil

rights complaint against his two defense counsel on May 8, 2002, just five days before jury

selection began in state court. Counsel told Judge Emmanuel, on the day trial began, that they were not even aware of the complaint until Petitioner mentioned it in court that day. That is consistent with this court's procedures, which require the complaint be screened for potential merit before any defendant is served with the complaint. The screening process in Petitioner's case resulted in dismissal of the complaint as frivolous, without any summons being issued. See Turner v. Goins, 02-cv-0942.

When a lawyer has a conflict of interest based on representation of multiple or serial defendants, a defendant may be able to establish a limited presumption of prejudice. Outside that context, however, the traditional Strickland analysis governs a claim that an attorney had a conflict between his personal interest and that of his client. Beets v. Scott, 65 F.3d 1258, 1259-60 (5th Cir. 1995) (en banc); U.S. v. Goodley, 183 Fed. Appx. 419, 421-22 (5th Cir. 2006). Thus, Petitioner bears the burden of showing deficient performance and prejudice, without the benefit of any presumption.

Public defenders are named in such suits routinely, and the suits are routinely dismissed during the screening process (because public defenders are not state actors for purposes of 42 U.S.C. § 1983), so no experienced public defender would be fazed by the filing of yet another frivolous suit against him that will be dismissed before service. Petitioner has not demonstrated that, because of his unserved and frivolous complaint, his attorneys changed any aspect of their performance or that any such change undermines

confidence in the verdict.  The state court's rejection of this claim was not an objectively unreasonable application of <u>Strickland</u>, so habeas relief is not permitted.

**Ineffective Assistance of Counsel: Conceding Guilt**

Petitioner argues that attorney Michael Vergis, a third member of the defense team who delivered his closing argument, rendered ineffective assistance because he conceded Petitioner's guilt to second degree murder.  The state court rejected this claim, and the record fully supports the decision.

Mr. Vergis' closing argument began by posing the case as a mystery.  The first question was whether a crime was committed.  He said the answer was yes because one man was dead and another seriously injured during a robbery.  His next question was which crime took place.  He then set forth what he believed were the facts established at trial, describing the robbers only as "black males" or "the short-haired man" and "the long-haired man." Vergis noted that a revolver had been found at the scene, but it was not fired.  There was no fingerprint or DNA evidence to link the revolver to Petitioner, and the police did not offer evidence as to whether they attempted to determine from serial number records who purchased the gun.  Vergis pointed to evidence that the short-haired man grabbed a hammer upon entering the store, which he suggested was strange action for a man armed with a pistol. He also questioned why the victim, if unarmed, would have so brazenly attacked the two armed robbers.  Vergis suggested that the gun actually belonged to the victim, that the victim confronted the robbers with his gun, but the long-haired man fired first.  Vergis continued:

Now, the question is, we have someone who is now deceased. That makes it murder. I believe, in this case, it's second degree murder, not first. And here's why: In order to have first degree murder, you have to show the specific intent to kill. It was the outcome they wanted. They went there with the intent to kill people. They wanted to do this, but that is not what happened. The robbery was taking place, things were going fine, and then a gunfight started and at that point, there was no intent to kill, there was intent to get out. That is general intent. Yes, he should have known better, but you sure weren't trying to kill anyone. You were going to be shot or be shot (sic). And that doesn't justify it. It's still wrong. It is still murder, but it's not first degree murder; it is clearly second degree murder. It is general intent.

Tr. 2028-32.

Vergis then went on, at length, to attack the reliability of the lineup and identification evidence and generally argue that there was no evidence Petitioner was either of the black males involved in the robbery. He also argued that the barbershop alibi was plausible because Santanian said there were still people hanging around outside when he left, and Ike merely did not recall seeing people when he left later. Vergis also pointed out that Petitioner did not offer an implausible alibi such as the unoriginal "I was with my girlfriend" claim that suspects so often offer. In conclusion, he asked the jury to "not convict the innocent in order to appease the injured." Tr. 2032-46.

Petitioner argued in his post-conviction application that counsel conceded his guilt to second degree murder without his consent, causing presumed prejudice under U.S. v. Cronic, 104 S.Ct. 2039 (1984), which applies when there is an actual or constructive denial of counsel. Even when counsel makes such a concession without his client's consent, a resulting

ineffective assistance claim is not judged under <u>Cronic</u> but under the traditional <u>Strickland</u> test that requires establishment of prejudice. <u>Haynes v. Cain</u>, 298 F.3d 375 (5th Cir. 2002) (en banc).

The trial court found "no indication that defense counsel conceded to Petitioner's guilt to the crime, or to his guilt of a lesser crime." Tr. 2557. The appellate court affirmed, with the additional observation that a partial concession to the strength to the state's case may constitute effective assistance, especially when it helps avoid the death penalty. Tr. 2638. The undersigned has carefully reviewed the closing argument and finds, like the trial judge who observed it, no factual basis for the argument that counsel conceded guilt to any crime. The argument about which Petitioner complains was plainly an alternative argument, and it was carefully crafted to never concede that Petitioner was at the scene of the robbery. There was never so much as a, "But if you find that Petitioner was the man who shot the victim ...." There was no concession of guilt whatsoever, and the state court's resolution of this claim was not an objectively unreasonable application of <u>Strickland</u> to the facts at hand.

**Prosecutor Vouching for Credibility**

Assistant District Attorney Tracy Moore delivered the opening statement for the state. She described the scene and the eyewitnesses. She then cautioned:

> Now, please keep in mind that some of the witnesses were very young and that this happened three years ago almost, July of '99. ... Some of the details may be sketchy and you will hear some inconsistencies, I'll tell you that right now.

* * * *

What's also clear is that the long-haired man had a gun. And
you will hear some inconsistencies about whether or not the
short-haired man had a gun, but all of the witnesses will tell you
that the long-haired man had a gun, that he told them to get to
the back ....

Tr. 1791-92.

Petitioner argued in his post-conviction application that this opening statement
amounted to vouching for the credibility of prosecution witnesses by implied reference to
matters outside the record, because no one had testified before the prosecutor said that the
testimony would be sketchy and inconsistent. Petitioner argues that the remarks were fatal
to the defense's ability to cross-examine the crime scene witnesses.

The trial court ruled that Petitioner was procedurally barred from raising the issue
because there was no contemporaneous objection made by the defense. Tr. 2537. The state
appellate court stated (mistakenly) that the trial court "found that the state did not vouch for
the credibility of its witnesses, in setting forth the facts by which it sought to prove, and did
prove its case." Tr. 2638.

Prosecutors must ordinarily refrain from expressing a personal belief or opinion as to
the truth or falsity of testimony or evidence or guilt of the accused. Otherwise, the
prosecutor's expressions of personal opinion take the form of unsworn, unchecked testimony
that may exploit the influence of the prosecutor's office. See, e.g. U.S. v. Young, 105 S.Ct.
1038 (1985). The portions of the opening statement to which Petitioner objects do not cross

those lines. Counsel was merely noting weaknesses in her own case in advance, which is sound strategy and in no way amounted to improper vouching for any witness.

Even if the opening statement could be deemed improper, it would not provide a basis for habeas relief unless it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986). Stated another way, prosecutorial misconduct must be so persistent and pronounced, or the evidence of guilt so insubstantial, that the conviction would not have occurred but for the improper remarks. Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988); Turner v. Johnson, 106 F.3d 1178, 1188 n. 46 (5th Cir. 1997). The prosecutor did not do anything improper in this case, and there is certainly no basis to find that the demanding prejudice standard was met. The state court's decision of this issue was not an objectively unreasonable application of the relevant Supreme Court principle, so habeas relief is not permitted with respect to this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an

extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 10th day of July, 2009.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE